Good morning. David Snyder on behalf of the Plaintiff Appellant, General Thompson. May it please the Court. This is a simple case. A simple case about an off-center concrete well stop. It should have been about the simple application of Nevada's substantive law regarding premise liability. Could you speak up a little bit? Yes, Your Honor. My apologies. This case should have been about simple application of Nevada's substantive law regarding premise liability and open and obvious hazards. It should have been about simple application of federal procedural law. About viewing the facts and how reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Instead, the District Court applied a heightened evidentiary standard and made this case about an opposite figure. Figure 3.1 of slip-and-fall practice, to the exclusion of much of Sherrill's proper evidence and expert opinions, and erroneously granted summary judgment in favor of the defendant appellee, Walmart Inc., denying Sherrill ordained court. Three conclusions underpin the District Court's erroneous error. First, that Walmart did not owe Sherrill the duty of care as an invitee under Nevada law. Second, that Walmart did not breach any duty to Sherrill. And third, that Figure 3.1 was dispositive of the incident matter. I'd like to address it in turn. Is the Nevada case that controls here the Foster case, Foster v. Costco? Yes, Your Honor, and I believe that's where I wanted to begin, and that's what's so troublesome about the District Court. That's the Supreme Court of Nevada, so under Erie, that's all she wrote? Yes, Your Honor. I mean, this case is before this court on diversity, jurisdiction, and Nevada's substantive law controls. What's interesting about the District Court's order here is it relied on Eldorado Club v. Graff primarily, which is a 1962 case. That case, the facts of that case deal with a leg sleeve on a ramp, so it's a temporary hazard in whether a premise owner could be liable under those set of facts, and the court there discusses permanent hazards and what type of standard a party may need to show for a liability to attach. What's interesting about the District Court's application of Graff in this case is the District Court repeatedly uses language from Eldorado Club that a permanent hazard must be unreasonably dangerous, and I believe it permeates the District Court's order, unreasonably dangerous, unreasonably dangerous. The problem is that the Supreme Court of Nevada never uses the term unreasonably dangerous in Eldorado Club v. Graff, but the word unreasonable or unreasonably dangerous is not in that court's opinion. It simply says that it must be dangerous. And the second problem with this is Nevada premise liability of law has changed substantially since 1962, and with that I would just like to highlight some of the court's recent jurisprudence on open and obvious hazards in premise liability law. In Foster v. Costco Wholesale Corporation, the Supreme Court of Nevada noted that rigid, I mean that harsh application of the older open and obvious hazard doctrine is unfair, and thus it departed from that line of cases and it adopted the secondary statement of torts, section 343A, which is the distraction exception to the open and obvious rule. Premise liability in Nevada may attach for obvious hazards when an invitee is distracted from observing or avoiding a dangerous condition. The Supreme Court of Nevada further adopted the third restatement of torts, section, yes, Your Honor? That's what I thought. You said they adopted the secondary statement. I think they went with the third, didn't they? Yes, so the court analyzes both. It discusses the secondary statement of torts, and it also addresses the third restatement of torts, section 51. So you're correct, Your Honor. Ultimately, they adopt the factors from the third restatement, which, again, this is a broad duty of care, not only to just invitees but all entrants except for flagrant trespassers and no party. I mean, Cheryl clearly was not a flagrant trespasser. It's a general duty of care to all entrants regardless of open and obvious nature of the dangerous condition. So the district court's conclusion that Walmart did not owe a duty of care to Cheryl is patently erroneous and contrary to Nevada law. Does that mean, incidentally, that in Nevada, once the plaintiff establishes a dangerous condition, they're entitled to a jury trial? Well, no, so there are factors that the court must weigh, and in this context, right, it's in opposing summary judgments, where Cheryl had to proffer some evidence in support of the various factors regarding an open and obvious hazard. And that brings me to the next point that I wanted to address. So if I may, for the court to find that the duty exists for an open and obvious hazard, there are four factors that it is to consider for the matter to go to a jury. First, the foreseeability and gravity of the harm. Second, whether there was a feasible and available alternative conduct that could have presented the harm. Third, whether there were distractions that would have prevented the entrant from observing this open and obvious harm. And fourth, whether the premise owner had reason to suspect that an entrant would proceed despite a known or obvious danger. And Cheryl proffered evidence in support of each of these elements in her opposition to summary judgment. I would just like to highlight a few for this court's benefit. How dark was it? Well, we have testimony in the record, which I will gladly cite to this court. Cheryl's lighting expert, Don Gifford, testified, this is an excerpt to Record 270, that the lighting in the parking lot cast a shadow. So when the car was parked, the lighting cast a shadow over the concrete rail stop. Walmart's assistant manager filed an incident report in this case. This is on page 124 of the record, saying that it was dark at the time of the event. I mean, the video shows very large light, but it's on the other side of the vehicle, the closest light. It's quite bright, but it's on the far side of the vehicle. That's correct. And I guess perhaps most troubling for Walmart is their own corporate representative, their federal rule of civil procedure, 3B6 Representative Robert Perry, stated in his deposition, and this is in page 89 and 92 of the record before this court, that it's dark in the parking lot. So, and again, I think it's important to, and I know the court's review of this record, but I just want to highlight where we'll find that this is on page 187 to 195 of this record, is Cheryl Thompson's uncontroverted deposition testimony about how she left her vehicle and what she encountered upon returning. She parked her car in the parking stall, exited with the nose of the car facing the wheel stop, exited on the driver's side, went behind her vehicle into the store, shopped. Upon returning, approached her Dodge Journey from the passenger side, loaded her groceries, and went around the front of the vehicle and did not see this wheel stop, and it's important to note, and Walmart's own expert witness stated as much in his rebuttal report, which is on page 118 of the record before this court, that Walmart knows that wheel stops are a tripping hazard, which is why they are nowhere else in that parking lot except in the handicapped section. Now turning to the feasibility and availability of alternative conduct, which the court has to consider. As I recall, they said that, and the obvious explanation of why it would only be in the handicapped spot is they think they're required to have it there by federal regulations. Were they? No. Walmart has had this case for quite some time now, and they still do not proffer any federal regulation or any county or municipal code that requires the use of a wheel stop in this instance. And I would like to explore that further, if I may. The figure that they rely on and that the district court placed a lot of weight on comes from Charles Turnbull's slip-and-fall practice, section 322.4. And I think the text that comes before this figure is incredibly important. I never knew exactly what that was, and it looked to me like it wasn't a government manual or explanation of CFRs. It looked like what it was was a practice manual for lawyers handling slip-and-falls. Yes, it looks like it's a treatise. A treatise, yes, Your Honor. And I want, since the court gave it weight, I just want to kind of address the text that comes with that before I move on to the lack of ordinances. That text states plainly that wheel stops are likely to cause tripping hazards, that they must be inset from limit lines to create free walkways between parked cars, that under reduced lighting and poor illumination people won't see them. I don't understand why, since all it is is a practice manual showing lawyers how to win slip-and-fall cases from one side or the other, it should be given any weight at all. Is there some reason? I think that it speaks to industry standards. I think our expert witness, Dan Averitt, used that and seven other treatises to try to help. There are treatises and treatises. You read Prosser on torts. That's a treatise by a law professor intended to explain what the law actually is, whether he likes it or not. Prosser actually didn't like it in a number of respects, but he says what it is. And a practice manual is different. It's how you can win a case rather than what the law, an academic manual on what the law is. Well, I mean, and giving you a question, Judge, I suppose that that would make singular reliance on the figure contained within this practice manual inappropriate for the district court to resolve this case. This figure, for one, it doesn't actually apply to this parking stall for an important reason, which the authorities I'm about to address will highlight. Is there any part of this diagram or the accompanying commentary that says that the protrusion of the stuff that is shown in the figure 3.1 is normative? I mean, because it doesn't, I mean, there is a bumper sticking out on the left side of the vehicle in 3.1, but I didn't see anything that said that you should do it that way. It just happens to be that way in the diagram, but am I wrong? Is there anything that says that's how to do it? No, Your Honor, and for the court's benefit, I mean, the best picture in the record before this court of this diagram is on page 244 of the record. This diagram has no measurements. It's 46. Oh, I'm sorry, Your Honor. Understood. Thank you very much. There are no measurements on this diagram regarding the wheel stop, which is what is at issue here. There's no metric by which to see it. I just want to highlight a few authorities because I noticed that my time is running out to return to the question posed. 36 CFR Part 1191 Appendix D, Section 502.7 has an advisory opinion for the Department of Justice. It recommends wheel stops only to prevent vehicle overhangs from reducing the clear width of accessible routes. The at issue stall in this case is not perpendicular or adjacent to a pedestrian pathway, period. On the other side is another parking stall, which notably does not have a concrete wheel stop. The Clark County, Nevada, Development Code 30.60.050A1E only requires wheel stops for the same reason, to prevent cars from intruding upon pedestrian walkways or from damaging raised planters and such. The Henderson, Nevada, Development Code 19.7.3F6A7 and 19.7.3F6B7, again, similar to the Clark County Development Code, they only require wheel stops to prevent vehicles from intruding into pedestrian walkways. I'm seeing that my time is running out. I'd like to reserve the rest for rebuttal. Thank you, sir. Thank you. Mr. Kaye. Good morning, Your Honors, and may it please the Court, Laurie Kaye, on behalf of the defendant of the Wal-Mart. I want to start with two of your questions. You asked about the lighting that was observed by the experts. Henderson Building Code requires at least one foot candle of light to be present in these sorts of stalls. Wal-Mart's expert, Mr. Grant, had that foot candle from the light that Judge Collins noted, anywhere from 2.3 to 3 foot candles. When he measured it, I don't understand why that matters. I mean, noncompliance with the municipal code might give rise to negligence per se, depending on what Nevada law is regarding negligence per se. But compliance doesn't show absence of negligence. That's a fair point. Judge Clinefield, I would just point out that it's the plaintiff's burden. I mean, I know what one foot candle is because I'm an amateur photographer, and it's not much light. And I would only point out here that both experts testified that there was sufficient light, and there's no dispute about that. It underfalls the case you pointed out. It is controlling, and it is Ms. Thompson's burden to prove. I thought that she testified that basically she didn't notice the wheel stop sticking out. And I thought that the expert evidence was that because of where the light was, it cast a shadow over the wheel stop, and I thought it was uncontested that the wheel stop was blue. It wasn't some fluorescent green or something like that. Yeah, and that was her theory. I got those facts right? You do, Your Honor. That was her theory of the case directly. And her testimony counts. I mean, one thing that's perfectly clear under common law of torts since time immemorial and under Nevada law now is you don't need an expert. Her testimony about facts that laymen can generally testify to is fine as evidence. She doesn't need an expert. You're correct on that point. But under Foster, I would note that the Nevada Supreme Court referenced the third restatement of the courts. In that case, my opposing counsel takes issue with Judge Maygan's use of an unreasonably dangerous condition. But let's go back to Foster because what it says in adopting the third restatement, and the standard there is a land possessor owes a duty of reasonable care to entrance on the land with regard to, and one of them is artificial conditions on the land that pose risk to entrance on the land. And then in assessing whether it poses a risk, there's factors about foreseeability and feasibility, et cetera, that are ticked off. Why isn't it clear just on that that there is a duty and that everything else goes to reasonable care and breach? And Judge Collins, that is a good point. And you have to go to comment I of the third restatement, section 51, that actually defines what a dangerous condition is. And I think this is largely the difference between the two parties. If we go to comment I in the third restatement, it defines the duty of reasonable care that Judge Collins, that you just referenced, as reasonable care to discover dangerous conditions on the land and to eliminate or ameliorate them, or if they can't be ameliorated, to be warned against. But the key in that is the dangerous condition. A landowner only has a duty that extends to dangerous conditions. And as Thompson quoted in her Brief from Black's Law dictionary, a definition of a dangerous condition is a property defect that presents a substantial risk of harm. So it's not as if any risk of harm triggers this duty. Judge Collins, it has to be a substantial risk, or as Judge Mahan phrased it, an unreasonably dangerous condition. So now, the thing that puzzles me is duty is a question of law. But in assessing the facts that go to that question of law, you know, we have to take the version of the facts in her favor. And so, here the district court, you know, started opining on the significance of charts attached to expert reports. It's not normally what you would think of as suitable for summary judgment. In Judge Collins, I think that was from the absence of evidence that Mrs. Thompson had actually proffered in opposing summary judgment. And I want to highlight that because it does go to some of those undisputed facts that are driving this analysis under Foster. And the first fact I would highlight for the bench is that there was Mrs. Thompson argued in her opposition at Walmart and prior notice that this was a dangerous condition or a condition that posed a substantial risk of harm. It was undisputed that in the prior ten years before this case, there were no incidents whatsoever in this wheel stop. It was also undisputed by both experts that there were no local code violations, no regulations violated. And I appreciate Judge Kleinfeld's point that that alone doesn't establish it. But it's certainly a factor to be considered. It was compliant with the ADA in the sense that there was a justification given for why this was allowed. So what? I mean, she tripped over it. That's evidence that somebody tripped over it. She tripped over the wheel stop. And if a lot of other people didn't trip over the wheel stop, that's a good jury argument that she should have watched where she was going, which often juries accept. However, in a comparative negligence jurisdiction, it often isn't sufficient. I just don't see how you'd keep it out of the jury's hands because she doesn't have negligence, per se, and other people haven't tripped over it. The only question, it seems to me, would be whether this artificial condition is a breach of the ordinary duty of reasonable care under the third restatement as adopted by Foster. What am I missing here? Judge Kleinfeld, let me address two points. I think the idea that she tripped over it doesn't necessarily make it a dangerous condition under the third restatement. It doesn't necessarily make it a dangerous condition. It doesn't make it one. It may be, but that is only one piece of the facts that were before Judge Mahan here. And so, you know, this isn't a normal situation where you have a defective wheel stop, there's some rebar protruding off the side. By all accounts, this was a properly painted, light, bright blue wheel stop that was left aligned. In Wal-Mart's expert, Mr. Grant, put forth three reasons why that is so, one of which was the ADA, but the other two reasons were so that a vehicle can't drive over the wheel stop, etc. Why did it have to stick out so far? It sticks out almost all the way to the edge of the parking space. Why did it have to stick out so far? That seems to be the question in terms of feasibility of alternatives. Judge Collins, you can actually find that too in Mr. Grant's report, Wal-Mart's expert. That's available at the record starting at page 11, running through 18. One of the reasons why he might align a wheel stop to the left, he testified there's two reasons. Again, one, a left wheel stop ensures that it will hit the vehicle's tire when the vehicle pulls it into spot. But the other reason is, and especially for elevated vehicles, a left-aligned wheel stop gives the driver identification that the wheel stop is there, whereas a center-aligned wheel stop doesn't necessarily provide that advance notice. I would also note, and Judge Kleinfeld, I will turn to Breach, since you raised that as well, because that's another problem with Mrs. Thomson's opposition at the summary judgment stage, is that she never provided any reasoning for why Wal-Mart breached. And I would go back to comment I did. What about the report from Mr. Everett? I mean, your expert offered what seemed like good reasons to do it the way they did, but he's an engineer citing ASTM guidelines, says you're not supposed to have these at all, and that in this space in particular, because there was the post for the sign, you really didn't need to have one. Why couldn't a jury credit that and decide that they believe him? It was unreasonable to have the thing positioned anywhere in the space. Mr. Miller, I would point out two things. One, Mr. Everett never conducted a site visit, and so I would cite the bench to your decision in 2019 in the case of Stevens v. Union Pacific Railroad, wherein you correctly said that an expert cannot create a material issue of fact based on speculation or assumption. That report has to be grounded in fact or data observed during the case. It's undisputed here that Mr. Everett did not conduct a site visit, and so his opinion, as you correctly referenced, is sort of a generic, almost extreme opinion that all wheel stops everywhere are unnecessary. And you're saying that that's, how do I know? I confess until this case I had never thought about whether and where wheel stops should be placed in parking lots, but how do I, who am not a civil engineer, looking at this report, just to say on the face of the report, it is plainly wrong to say that you shouldn't have wheel stops in parking lots. How am I able to say that? Well, I think you get there in two different ways, Judge Miller. One is that that is ultimately a legal conclusion. That is, in essence, saying that all wheel stops are dangerous conditions. That is his approach. That is an inadmissible thing for expert testimony. But the second way you get there is, again, that there was no site visit. This would be a very different case had Mr. Everett visited this particular Walmart store and observed the pedestrian flow of traffic or otherwise conducted some analysis to see whether, in fact, had pedestrians at this store moved through that left side of the parking lot and actually see why this opinion even matters. This is all stuff that laymen can understand just fine. And I think that is a fair point. I don't understand why the other expert's testimony matters for the same reason. I can't think of something easier for laymen to understand than wheel stops. They all go to the grocery. They all park in parking lots. And I would point to the decision in Allen, Judge Dorsey's opinion, and she embraced Judge Miller's question and said that wheel stops, as a matter of law, are not unnecessary because that's what the plaintiff, in lay terms, tried to argue, is that, in essence, all wheel stops are unnecessary because they're unnecessary to protect the ball or tears. I tripped over a wheel stop. The wheel stop was in a funny position. The question would be was it unreasonable for the landowner to have the wheel stop in a funny position that people might not anticipate where she can't walk around her car around the front without either stepping over the wheel stop or tripping over it. A little funny position because everybody's parked in parking lots with wheel stops, and usually you can walk by on either side. And then Walmart has a lot of defenses. If you park a van there, the people in wheelchairs are going to get in from the passenger side because that's how the wheelchair vans usually work, all that kind of thing. I just don't see why any of this matters or why there isn't just a jury question about whether it was a failure to exercise reasonable care when they put the wheel stop in a funny position that some people wouldn't anticipate and might not notice. Nevada, in fosters, even eliminated the rule of if you could have seen it, then it's an open and obvious condition, so the landowner's not liable. That's not the law of Nevada anymore. I must just be oblivious to something in your argument. Foster still directs that it has to be a substantial risk of harm, and I think that's a different theory. If it's not tripping and falling on your face, why wouldn't it be? I think any physical condition on a property can present some risk of harm. Now, I think it's substantial, it does a lot of that. Old people die from a hip fracture 20 to 30 percent of the time. It's an often fatal injury. It's much more dangerous than the first wave of COVID, vastly more dangerous, and usually they get the hip fracture by tripping and falling. Handicapped spot, a higher percentage of people are likely to be vulnerable. I don't see why a jury can't evaluate whether this is unreasonable. I think that would get you past the duty stage. It still wouldn't get you to the breach stage, and that's what Judge Mahan found was that there was an absence of evidence, not just on duty, but also breach. In driving his conclusions there, we're given that this was a wheel stop. Under comment I to section 51 of the third restatement, to have a breach, you have to have either a failure to correct a dangerous condition or a failure to warn, and in this particular case, you have a warning. You have a brightly colored handicapped stall. You have not enough evidence. The evidence can be interpreted by the jury to mean it's blue, which means it's not super visible, and the light is behind the car, so the car will cast a shadow over it, not that it's a brightly lit concrete block. Judge Kleinfeld, even if you get there, there's also testimony undisputed for Mrs. Thompson that when she wheeled her cart out of the front of the store, she went through the parking spot adjacent to the right and saw a wheel stop there, which would provide her with the warning necessary that there are, in fact, wheel stops. But Nevada law says even a warning, and even knowing it's there, may not be enough to eliminate liability of the defendant. I mean, Nevada law is really pro plaintiff here. I don't know that Foster has read quite that broadly. Judge Kleinfeld, I would say, again, here, that in the evidence, it was Mrs. Thompson's burden to provide some. If you suggest a warning isn't enough, there would be some necessity to provide an alternative way to build this parking structure that both accomplishes the reasons that Walmart built it in a left-of-line manner, and there's no evidence in the record. In fact, if you look at the opposition to the motion for summary judgment, her basic argument is Mr. Abbott's argument. They've got this language in Foster, Costco is not free from liability under Nevada law solely because the danger of the pallet. Foster didn't watch where it was going in the store and had a pallet. It's not free from liability solely because the danger of the pallet may have been open and obvious to Foster. I mean, he just walked in and something was right in front of him. It's fair that Foster took the get-out-of-jail-free card away from an open and obvious condition, but it still required a plaintiff to prove a dangerous condition. Foster, you're right, it was a temporary pallet in an aisle. An employee was loading boxes on and off. It wasn't a permanent structure. And I would point you to the Sprague decision, which said that landlords are not insurers of all accidents on the property. Foster didn't overrule Sprague. I don't think it didn't reference Sprague in any way and say it was retracting from that statement. And so I would suggest that even if you get over the theory hurdle here, you still don't have evidence of breach, and so you have to affirm judgment. I see one last question, which is, in your brief, you say that the claims here raise, you used the phrase, the specter of conflict preemption. Did you actually make a conflict preemption argument in the district court, or is that just sort of atmospheric? We did not, Judge. Okay, Walmart did not make that argument, but it would raise an issue potentially. But I think the court doesn't need to reach that. It can get there other ways. Thank you very much. Thank you, and I would just like to address a few points made by opposing counsel. First, our expert witness differed. This is on Exhibit Record 269. He, in his report, states that the shadow blocked the light, so it's not necessarily true. I think it's a stretch to say that he agreed, that there was no dispute about the lighting. Second, Walmart's reliance on comment I of the third restatement. I understand and appreciate that opposing counsel did not draft the briefs incanently, but they did not address this in their answering brief in any way, shape, or form. I think it's improper for them to raise new authority in their oral argument. As to no incidents prior, Walmart's own corporate representative, Robert Perry, testified, and this is on page 98 of the record before this court, that he didn't actually look on Walmart's wire service to see if there were any prior incidents of disregard in this case. So I think that also is an inaccurate statement of the record before this court. Regarding bollards, again, Walmart's own corporate rep testified, this is on page 94 of the record before this court, that cars can't drive through concrete bollards and that they would, therefore, serve the purpose of preventing vehicles from moving forward into parking stalls, which would make the concrete bill stop unnecessary. Opposing counsel's reliance on Stevens versus Pacific Railroad, again, this is not in their answering brief. It's inappropriate for them to raise new authority in an oral argument. I've never heard this notion that you can't raise new authority, you can't raise new arguments in an answering brief. No, no, Your Honor, it's not in their brief. They're raising this case for the first time in an oral argument. I haven't had the opportunity. I don't understand that there's any rule against that. It's just new authority. I understand, Your Honor. I won't belabor that. As opposed to a new argument. Last thing I would like to note, their reliance on Lucky versus Spray. It's true that Foster versus Costco Wholesale Court does not expressly overturn Spray, but a little nuance in Nevada law. Spray's holding has to do with a grocery store and whether there's continuous debris in a grocery store, that the grocery store should know it's going to cause folks to slip and fall. In that case, the Supreme Court actually reversed the district court's granted summary judgment, finding there were genuine issues of material fact as to whether a jury could find that that was a dangerous condition. And it relied on Gunlock versus New Frontier Hotel, which the Supreme Court of Nevada expressly overruled in Foster versus Costco Wholesale. So the underpinnings of Spray are Gunlock. Gunlock is no longer the law in Nevada. And with that, I see my time is up. I will submit. Anything? Thank you, counsel. We thank both counsel for their helpful arguments this morning. The case is submitted.
judges: KLEINFELD, MILLER, COLLINS